JACK TAR OF ARK., INC. *v.* NATIONAL WELLS TELEVISION, INC.

5-2488                                           351 S. W. 2d 848

Opinion delivered December 11, 1961.

*Wootton, Land & Matthews,* for appellant.

*R. Scott Campbell,* for appellee.

ED. F. McFADDIN, Associate Justice. The appellee, National Wells Television, Inc., filed this action in the Garland Circuit Court against the appellant, Jack Tar of Arkansas, Inc., for amounts claimed due under the terms of a contract between the parties, dated October 15, 1955. Trial before the Circuit Court without a jury resulted in a judgment for the plaintiff; and this appeal ensued in which the appellant challenges the correctness of the Circuit Court judgment, raising four points, which will be consolidated and discussed.

The basic question is whether the appellee as a foreign corporation is barred from maintaining the present suit; and the Circuit Court answered the question in the negative. Three corporations are to be identified:

(1) Jack Tar of Arkansas, Inc. (hereinafter called "Jack Tar") is and was at all times here involved an Arkansas corporation engaged in operating a motel[1] in Hot Springs, Arkansas.

(2) Wells Television, Inc. (hereinafter called "New York Wells") is and was at all times hereinafter mentioned a New York corporation that never qualified to do business in Arkansas.

(3) National Wells Television, Inc., (hereinafter called "National Wells") is and was at all times here involved a Delaware corporation that qualified to do business in Arkansas on October 4, 1955, and has been domesticated since that date.

On February 9, 1955, New York Wells and Jack Tar entered into a contract whereby New York Wells was to install and maintain forty television sets on the premises of Jack Tar in Hot Springs, was to receive a specific rental per day for each such television, and the contract was to continue for five years. On September 9,

---

[1] Webster's Third New International Dictionary has this definition of motel: "A hotel for automobile tourists."

1955, negotiations began between New York Wells and Jack Tar for a modification of the contract. On October 15, 1955, New York Wells and Jack Tar agreed to mutually cancel their contract of February 9, 1955; and on the same day (October 15, 1955) National Wells and Jack Tar entered into a new contract concerning the forty television sets located in the Jack Tar Motel in Hot Springs, Arkansas. This contract was in the form of a letter, which we copy in full:

"NATIONAL WELLS TELEVISION, INC.

"October 15, 1955

"Jack Tar of Arkansas Inc.
856 Park Avenue
Hot Springs, Arkansas

"Attention: Mr. R. B. Ellis

"Gentlemen:

"This will confirm our understanding in regard to our installation of the R. C. A. Master Antenna System, together with 40 R. C. A. Victor 21" Television Sets.

"We will leave on the promises of the Jack Tar the Radio Corporation of America's Master Antenna System together with 40 connecting outlets and the 40-21" RCA Victor Television receivers with matching stands. We will continue to bear all cost of maintenance and repair of both the Master Antenna System and the television sets. You are not to be held responsible for any loss or damage to our television sets or system.

"In consideration of the above, for a period of 56 months from the above date you will pay us at a rate of 40 cents per calendar day for each television set which we have installed in the Jack Tar Hotel. The Jack Tar Hotel agrees to make payments of such rent in monthly installments in advance, the first payment becoming due on the date above and subsequent payments becoming due at intervals of one month thereafter.

"If the hotel fails to pay any installment of rent within thirty (30) days after it becomes due, or fails to perform all of the conditions on its part to be performed, Wells shall have the right to terminate this lease without notice and take immediate possession of and remove from the hotel the television sets, system and related equipment. The hotel hereby grants to Wells or its duly authorized representative, permission to enter the hotel for such purpose and agrees that Wells shall not be liable for any reasonable acts in the removal of such equipment. In any such event, and in addition to any unpaid rent accrued to the date of termination, the hotel shall remain liable for and shall promptly pay to Wells for liquidated damages and stipulated damages an amount equal to the rent reserved hereunder for the unexpired portion of the term, discounted at the rate of 4% per annum to the present worth, together with all expenses Wells may reasonably incur in connection with retaking of possession of said system, television sets and related equipment and collecting the sums due hereunder.

"This instrument contains the entire agreement between Jack Tar Hotel and Wells. The right of Wells at any time to require strict performance shall not be affected by any previous waiver or course of dealing.

"This agreement shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, administrators, executors, successors and assigns.

"Very truly yours,

NATIONAL WELLS TELEVISION, INC.

/s/ Thomas A. Cronin

"ACCEPTED FOR:

JACK TAR OF ARKANSAS, INC.

/s/ R. B. ELLIS, Manager."

It will be observed that by the said contract of October 15, 1955, the payments were to be on the basis of 40 cents per calendar day for each television, and the contract was to continue for 56 months from October 15, 1955. The officers of New York Wells and National Wells are the same, and the two corporations have the same office address. From time to time, National Wells wrote Jack Tar letters about the October 15, 1955 contract; and some of the letters were written on stationery of New York Wells and signed by New York Wells. Jack Tar's rental checks, in three instances, were payable to "Wells Television, Inc."; and all the other checks were payable to "National Wells TV." There can be very little doubt but that New York Wells and National Wells have interlocking directorates;[2] but it must be remembered that National Wells has been domesticated in Arkansas ever since October 4, 1955.

In July of 1958 Jack Tar ceased making payments to National Wells and thereafter National Wells filed the present action against Jack Tar for the amounts due under the contract of October 15, 1955. For defense, Jack Tar claimed (*inter alia*) that National Wells was not the owner of the forty television sets; that neither New York Wells nor National Wells was authorized to do business in Arkansas when the original contract was made in February, 1955; that the instrument dated October 15, 1955 was an amendment to the original contract and was not a new contract; that National Wells was a mere assignee of the original New York Wells contract and that as such assignee National Wells could not maintain the action because of §64-1202 Ark. Stats. The case was submitted to the Circuit Court without a jury; the judgment of the Circuit Court was in favor of National Wells; and from that judgment Jack Tar prosecutes this appeal.

---

[2] Webster's Third New International Dictionary defines "interlocking directorate" as "A directorate linked with that of another corporation by interlocking directors so that the businesses managed by them are to some degree under one control."

I. On this appeal, Jack Tar urges that there is no showing that National Wells owned the forty television sets when the contract was signed on October 15, 1955; but we consider this point as immaterial to the real issue, which is next to be discussed. On October 15, 1955, Jack Tar signed a rental contract with National Wells for the forty television sets, and still had them at the time of the trial from whence comes this appeal. Whether we view this contract between National Wells and Jack Tar as a bailment or a sale, the end result is the same.

In *Estes* v. *Boothe,* 20 Ark. 583, we held that in an action by a bailor against a bailee it was no defense for the bailee to assert title in some third party while the bailee still held the property. In 6 C. J. 1108, ''Bailments'' § 37, the rule is stated:

''The more generally accepted rule is that the bailee may not deny the title of the bailor, either by claiming title in himself, or by alleging title in another, subject, however, to the exceptions that the bailee may show as against the claim of the bailor that he has been deprived of the property by process of law or has yielded possession to one having paramount title, or that he is defending on the title and right and by the authority of a third person.''

None of these exceptions were shown by Jack Tar in this case, and so Jack Tar is in no position to question the title of National Wells.

If we view the contract between National Wells and Jack Tar as a sale, then the case of *Sumner* v. *Gray,* 4 Ark. 467, is conclusive against Jack Tar; because we there held that the vendee of personal property, while he remains in possession and has not been evicted by a paramount title, cannot defend against an action for the purchase price on the ground that the vendor had no title. This holding was emphasized in *Seaborn* v. *Sutherland,* 17 Ark. 603: ''It would be unjust to permit the vendee to retain possession and enjoy the benefit of the property, and put his vendor at defiance.''

In short, we find no merit in appellant's argument as to which corporation owned the equipment involved in the suit. (Mr. Cronin, the Vice-President of both corporations, testified that the transfer was made between the two corporations.) Appellant executed the contract with National Wells without questioning its ownership of the equipment, and appellant operated under the terms of the contract for approximately three years. It cannot now obtain relief from its obligation by making this belated claim.

II. The other points urged by Jack Tar on this appeal relate to the legal right of National Wells to maintain this action in view of §64-1202 Ark. Stats., which provides that any foreign corporation which shall fail to domesticate in Arkansas and shall do business in this State shall not only be subject to a fine but also, "any foreign corporation which shall fail or refuse to file its articles of incorporation or certificate as aforesaid, cannot make any contract in the State which can be enforced by it either in law or in equity, and the complying with the provisions of this act after the date of any such contract, or after any suit is instituted thereon, shall in no way validate said contract."[3] In *Republic Power & Service Co.* v. *Gus Blass Co.*, 165 Ark. 163, 263 S. W. 785, the question was whether the plain-

[3] The history of § 64-1202 Ark. Stats. is extremely interesting. By Act No. 216 of 1901, the Legislature of Arkansas provided that no undomesticated foreign corporation "shall be authorized to sue on any contract made in this State." In *Woolfort* v. *Dixie Cotton Oil Co.*, 77 Ark. 203, 91 S. W. 306, it was held that a foreign corporation might recover on a contract made in this State, even though the foreign corporation did not domesticate until after the commencement of the suit. By Act 313 of 1907 (known as "The Wingo Act"), it was provided that domesticating after the suit was filed would not allow the suit to be maintained on the contract. That Act was construed in *Watkins Medical Co.* v. *Mosley*, 139 Ark. 294, 213 S. W. 385, and it was held that if the foreign corporation domesticated before it brought suit, it could still sue on the contract, even though made before the corporation domesticated. Then, by Act 687 of 1919, the statute was further amended to read as we now have it in § 64-1202 Ark. Stats., i.e., ". . . and the complying with the provision of this act *after the date of such contract*, or after *any* suit is instituted *thereon*, shall in no way validate said contract." (Emphasis contained in original act.) These changes are discussed in an annotation in 75 A.L.R. 455.

tiff, as a foreign corporation, could recover on a contract, and we said:

"The test to determine whether the plaintiff is entitled to recover in an action like this, or not, is his ability to establish his case without any aid from the illegal transaction. If his right to recover depends on the contract which is prohibited by statute, and that contract must necessarily be proved to make out his case, there can be no recovery."

Applying that test to the case at bar, it is apparent that in order to recover National Wells must claim exclusively under some contract, complete in itself, and dated after October 4, 1955, when National Wells domesticated in Arkansas. With this in mind, we turn to the contract dated October 15, 1955, between National Wells and Jack Tar. It has been previously copied *in extenso*. It contains, in itself, a complete contract between National Wells and Jack Tar, and unilateral expressions in subsequent letters did not have the effect of varying the contract. The previous contract between New York Wells and Jack Tar was not void. It was merely unenforceable in the courts of the State, but it could and did provide the basis for future negotiations. *Waxahachie Medicine Co.* v. *Daly*, 122 Ark. 451, 183 S. W. 741. Evidently National Wells recognized some time after February, 1955, that New York Wells had entered into a contract in Arkansas without domesticating; so National Wells domesticated on October 4, 1955, and the original Jack Tar contract was cancelled by mutual consent and the new contract of October 15, 1955 was entered into. It is complete in itself. It concerns the forty television sets in the Jack Tar Motel; provides that the rate of pay is 40 cents per calendar day beginning on October 15, 1955; that the payment is to be monthly in advance; and that the contract is to run for fifty-six months. Jack Tar made payments under that contract from October, 1955, until some time in 1958; and then, at that late date, decided to claim that the contract could not be enforced because of § 64-1202 Ark.

Stats. We find no merit in such claim. The contract here sued on was entered into after October 4, 1955, the date of domestication; and this fulfills the statutory requirement. Affirmed.

HARRIS, C. J., dissents.

CARLETON HARRIS, Chief Justice, dissenting. I do not feel that the contract between Jack Tar Hotel and *National Wells* Television can stand without aid from the unenforceable transaction entered into between Jack **Tar** and *Wells* Television. In other words, the contract entered into on October 15, 1955, is not complete within itself, but depends upon an earlier agreement entered into between Tar and Wells on September 1, 1955. This is clearly shown by a letter from Arnold Wells, executive vice-president of National, to Jack Tar, dated January 20, 1958, wherein he stated:

"We are enclosing a copy of our present agreement with your hotel. As you will note, the agreement is dated October 15, 1955, but the effective starting date of the contract was September 1, 1955, as indicated in attached copy of Mr. Ellis' letter on September 16, 1955, and Mr. Cronin's letter of September 20, 1955.

*The term of the agreement is for a period of 56 months, starting September 1, 1955, and terminating April 30, 1960.*"[1]

This letter has reference to a contract entered into between Jack Tar and *Wells Television* on the date mentioned in the letter (which amended the original contract of February 9, 1955) and it seems clear to me that the *October 15th contract between National Wells and Tar was dependent upon the September agreement between Tar and Wells.* Appellant accepted the proposal and supplied the agreed consideration for the month of September, 1955.

The record is replete with letters in 1958, written on *Wells* stationery, with various references to the contract, for instance, a reminder that rentals under "our"

---

[1] Emphasis supplied.

agreement for certain months, have not been paid, and acknowledging receipt of rentals for various other months. On October 3, 1960, an audit confirmation of indebtedness was sent to Tar, and in Item 1 appears: "Date of contract, (in ink) 9-1-55."

Because I am unable to ascertain how proof of the October contract between National Wells and Tar can be made without reference to the agreement between Tar and Wells in September, 1955, I respectfully dissent.